**Ellis CARP, Appellant,**

v.

**CALIFORNIA–WESTERN STATES LIFE INSURANCE COMPANY,**
Appellee.

**No. 16464.**

United States Court of Appeals
Fifth Circuit.

Feb. 19, 1958.

Henry Klepak, Dallas, Tex., for appellant.

George E. Seay, Dallas, Tex., for appellee.

Before TUTTLE, JONES and BROWN, Circuit Judges.

TUTTLE, Circuit Judge.

The appellant, Dr. Ellis Carp, named as the beneficiary in a certificate of cov-

erage under a group life insurance policy issued by the defendant-appellee, California-Western States Life Insurance Co., sued to obtain payment from the latter of the insurance proceeds of $10,000. This appeal is from a judgment entered upon a jury verdict finding the defendant company free from liability under the policy. The principal question is whether the person in whose name the certificate was issued was an employee of the company that obtained the master policy of insurance within the meaning of the insuring clauses of the policy.

On August 1, 1952, the defendant, California-Western, issued its master policy of group life insurance to cover the employees of the Dal-Tex Optical Company of Dallas, Texas. Pursuant to an application submitted by the employer in February, 1955, California-Western issued a certificate of coverage under the policy, effective March 1, 1955, to Mrs. Mary F. Carp, evidencing insurance upon her life in the amount of $10,000, and naming the appellant, Dr. Ellis Carp, her son, as beneficiary. A few weeks later, on March 16, 1955, Mrs. Carp died. Dr. Carp submitted a timely proof of death to the defendant and made claim for the insurance proceeds. The company rejected the claim upon the ground that Mrs. Carp never became eligible for coverage under the terms of the policy.

The insuring clauses of the policy are quoted in the margin.[1] Generally, the policy provides life insurance for full-time employees, directly employed and compensated for services by the Dal-Tex Company. All employees *actively at work* on *full time* and *for full pay* on the effective date of the policy are eligible. Employees then absent become eligible upon their return to work. Future

1. "Insurance Schedule

"As used in this policy, the word 'employee' means a full-time employee who is directly employed and compensated for services by the Dal-Tex Optical Co. All employees, except those of the excluded classes, who are actively at work on full-time and for full pay on the effective date of this policy, and those employees then absent, upon their return to active work, and new employees, shall be eligible for coverage—except that in no case shall any Future New employee be eligible until he has completed One Month of continuous service and is then actively at work on full-time and for full pay."

As provided in a rider agreed to after the issuance of the original master policy, the amount of insurance for each employee at the time material to this controversy was based upon his classification in accordance with the following table:

| "Classification | Amount Of Insurance | Maximum Amount Which The Employee May Be Required To Contribute |
|---|---|---|
| [A.] Owners & Supervisors | $10,000.00 | $6.00 |
| [B.] Doctors | 5,000.00 | 3.00 |
| [C.] All Other Employees including Out of State Employees | 1,000.00 | .60" |

Finally, the policy provides:

"Each eligible employee who has agreed to make the required contribution towards the cost of the insurance shall be insured in accordance with the foregoing 'Insurance Schedule' provided that:

"(a) Any employee who makes written application on forms furnished by the Company to the Employer, before the date of becoming eligible for insurance hereunder or within one month (not less than thirty days) after the date of such eligibility, shall be insured from the date such application is received at the Home Office of the Company or from such date of eligibility, whichever shall be the later date, provided that on such later date such employee shall then be regularly performing the duties of his occupation for the Employer on a full-time, full-pay basis, otherwise on such employee's return to full-time, full-pay active duty for said Employer."

new *employees*, the only classification under which Mrs. Carp could qualify, become eligible upon the completion of one month of continuous service providing they are then *actively at work* on *full-time* and *for full pay*.

Coverage is provided in amounts of $10,000, $5,000, and $1,000, depending upon the classification of the employee, within one of three listed categories: "Owners & Supervisors," "Doctors," "All Other Employees including Out of State Employees."

The application submitted by the employer to California-Western on behalf of Mrs. Carp listed her occupation as "supervisor Purch." and placed her in the Owner & Supervisor classification for insurance purposes. The application was dated February 9, 1955, and stated that Mrs. Carp had become permanently employed on February 1, 1955. The certificate of coverage accordingly issued by the defendant to Mrs. Carp provided life insurance benefits in the amount of $10,000, under the "A" classification.

The company has relied upon two specific grounds in resisting the appellant's claim for the proceeds: (1) that Mrs. Carp never was a full-time, full-pay employee of Dal-Tex Optical Co. as defined by the terms of the policy; (2) that if she was such an employee, she was not a supervisor and not entitled to $10,000 of insurance, but at most only $1,000, under the "C" classification, which covers ordinary employees. The jury returned a verdict reading: "We, the jury, find for the defendant not a full time employee or a supervisor."

It is our view that the record amply sustains a finding that Mrs. Carp never became eligible for insurance under the master policy issued by the defendant because of her failure to attain the status of an employee as defined by the policy. Our decision upon this matter will completely dispose of the controversy presented by the appeal and it is therefore unnecessary to comment upon the defendant's contest of Mrs. Carp's designation as a supervisor by Dal-Tex. However, in addition to the primary question of factual sufficiency, the parties have joined issue upon a number of rulings of the court on pre-trial motions and matters arising during the trial. A discussion of each of these points individually likewise becomes unnecessary in view of our disposition of the appeal. The parties' contentions upon these issues, however, derive primarily from their respective theories of the case and combine to raise a question concerning the burden of proof in a case of this nature, a matter deserving of comment.

The appellant's basic position is that the defendant, California-Western, can free itself from liability under the policy only on the showing of false representations concerning the employment of Mrs. Carp and that it must proceed upon a theory of avoiding the contract and therefore must bear the burden of proof. The defendant on the other hand argues that the appellant has simply failed to prove compliance with the terms of the policy upon which he must rely to secure its benefits. It argues that the burden is upon the appellant to prove that the conditions giving rise to coverage have been fulfilled.

With respect to the issue of whether the person in whose name a certificate of coverage has been issued is an employee as defined by the foregoing provisions of the policy, which is the ground upon which we dispose of this appeal, the defendant has correctly perceived the nature of the controversy.

It is clear, generally speaking, that the burden is upon the plaintiff to prove the existence of a contract (Sutton County v. Security Trust Co., Tex.Civ.App., 61 S.W.2d 862). The rule is no different where recovery is sought under a policy of group life insurance:

"Plaintiff, the beneficiary of any insurance carried by the deceased, can recover, if at all, only under the provisions of the group policy contract, and the burden of proof was upon her to establish that right." Minnesota Mut. Life Ins. Co. v. Newman, Tex.Civ.App., 157 S.W.2d 667, 670.

Similarly in Wann v. Metropolitan Life Ins. Co., Tex.Com.App., 41 S.W.2d 50, 52, it was stated:

"In order for plaintiff in error to set up a cause of action under the terms of the certificate, it was incumbent upon him to allege and prove that the provisions of the group policy, when construed in connection with the certificate and rider, entitled him to recover for the disability resulting from the injuries sustained in the service of the employer."

Although the problem of allocating the burden of proof was not directly involved in the foregoing cases, any doubt concerning the law of Texas on the specific question as it is presented in this case, would appear to be resolved in Schooley v. Metropolitan Life Ins. Co., Tex.Civ.App., 77 S.W.2d 886, 888, where the issue of the sufficiency of the evidence to support recovery under the policy was directly raised. There the court stated, citing Wann v. Metropolitan Life Ins. Co., supra:

"It was incumbent upon the appellant to allege and prove that Schooley was an employee within the meaning of the policy, construed in connection with the certificate and rider issued to him, at the time of his death * * *"

The company therefore in contesting the employee's eligibility for insurance under the group policy is not raising an issue of invalidity upon which it might bear the burden of proving a specific defense, but simply the failure of the employee to satisfy the policy provisions. That questions of coverage do not relate to the invalidity of the policy is also demonstrated in those decisions allowing the insurance company to raise that defense after the expiration of the incontestable period where it is held that the company is seeking to enforce the contract and not avoid it (see Fisher v. United States Life Insurance Co., 4 Cir., 249 F.2d 879). It is our holding, in the light of the foregoing authorities, that the burden of proof on the issue of employment, is clearly upon the plaintiff.

Turning to the primary issue of factual sufficiency, the evidence controlling that question, briefly summarized, is this:

Dr. Ellis Carp, the beneficiary named in the certificate, is a licensed optometrist and member of a partnership doing business in Texas and several other states as the Lee Optical Company. He is also secretary and a holder of one-third of the stock of Dal-Tex, which is a manufacturer and distributor of optical supplies—spectacle frames, lenses, and accessories—and one of Lee Optical's major suppliers. Among the accessories handled by Dal-Tex and supplied to Lee Optical are optical trims—the ornamentation applied to glasses frames, particularly women's frames, to make them more attractive.

Mrs. Carp, as noted before, was Dr. Carp's mother. She was 68 years old and lived in Mount Vernon, New York, with her daughter and son-in-law. She had for many years done needlework and crocheting as a hobby and in this work had undertaken to make her own designs. On a visit to his mother in the fall of 1954, Dr. Carp saw some of her designs and it occurred to him that they could be used as patterns for optical trims. He took some of the needlework with him and upon his return to Texas showed it to Dal-Tex's president, Mr. Irving Greenberg.

Greenberg agreed that there might be commercial possibilities in Mrs. Carp's designs as patterns for trims and he asked Dr. Carp to have his mother submit some drawings of needlework designs. Arrangements were accordingly worked out for the submission and evaluation of Mrs. Carp's designs. Dr. Carp called his mother and told her to go ahead with her work and to send some drawings to Dal-Tex. He continued as he testified to keep in touch with her every few days to transmit instructions concerning the designs and drawings. Greenberg called the manufacturer of

the trims, the Blue Ribbon Optical Company in New York, and informed its president about Mrs. Carp and asked that he keep in touch with her and assist her in the production of acceptable designs. Dr. Carp likewise told his mother about the Blue Ribbon Company and asked her to keep in touch with the people there. Eventually an arrangement was worked out whereby Mrs. Carp was to submit her designs directly to Blue Ribbon in New York rather than send them to Dallas. Greenberg's general understanding with the Blue Ribbon Company was that whether the drawings came from Dal-Tex or from Mrs. Carp directly, he was to look at them, see whether they would fit the frames that Dal-Tex was using and make samples to send to Dal-Tex.

In time, during the succeeding months, several of Mrs. Carp's designs were produced as finished trims and sold well. From them both Lee Optical and Dal-Tex were able to reserve some for their exclusive use.

No steps were taken to enroll Mrs. Carp as an employee of Dal-Tex until several months after the discovery of her needlework designs and the submission of her first drawings. No particular reason is given in the testimony for the time chosen to put Mrs. Carp on the payroll. The plaintiff offered evidence, however, from which it appears that status as an employee was contemplated from the beginning.

Greenberg testified that after having seen Mrs. Carp's needlework he told Dr. Carp that if he could obtain designs of that type he would be interested in employing a person who could produce them. Greenberg also testified that after having seen the drawings which Mrs. Carp submitted, he reached a personal decision that he wanted her on the payroll. Greenberg also testified that he planned to organize a company in New York to handle trim designs and that he intended that Mrs. Carp should supervise it. These plans were not realized, however, before Mrs. Carp's death.

Evidence dealing with the administrative details of Mrs. Carp's hiring is found in the testimony of Richard Muller, the office manager of Lee Optical Company. He testified that he handled some of the records for Dal-Tex Optical Company and based upon the information he received from Greenberg he enrolled Mrs. Carp as an employee of Dal-Tex and completed her application for coverage under the group life insurance policy. He was not instructed, he testified, concerning her insurance classification, but based it upon her position with the company, described by him as follows:

"Q. I will ask you, did you ever place Mary Carp on the payroll? A. We did.

"Q. For what company? A. Dal-Tex Optical Company.

"Q. What were the duties she was to perform? A. She was to supervise and design and purchase certain materials.

\*     \*     \*     \*     \*     \*

"A. She was designated to be in charge of designing and purchases, designing and supervising, the work of this purchasing department."

Finally, as documentary evidence of Mrs. Carp's status as an employee Muller identified certain forms and reports normally associated with an employee relationship: A copy of the Form W-2 reporting to the government Mrs. Carp's salary and the amount of taxes withheld during her purported employment along with a copy of the compensation record maintained by Dal-Tex recording her status as an employee and her salary payments. Also Muller testified that Mrs. Carp's salary had been set at semimonthly installments of $250.00 each and that after deductions for social security and similar items she actually received $204.10 for each pay period. As evidence of salary payments to Mrs. Carp, Muller identified three checks payable to her dated respectively February 15, 1955, February 28, 1955, and March 15, 1955. He stated that he had issued the first two of these about March 1, having over-

looked issuing her the February 15 check.

Such generally is the evidence that the jury was free to consider as supporting a finding that Mrs. Carp was an employee of the Dal-Tex Optical Co. within the meaning of the defendant's master policy of insurance. The record does not compel a finding in the plaintiff's favor, however, and we conclude that the jury was authorized to find, as it did, that Mrs. Carp was not employed by Dal-Tex and that the insurance upon her life was applied for and issued without reference to her status as an employee of Dal-Tex.

Support for even a permissible inference of a genuine employment relation between Dal-Tex and Mrs. Carp requires acceptance by the fact-finders of the assertions of Greenberg and the plaintiff's other witnesses who directly testified that Mrs. Carp had in fact been hired. Although the jury could consider upon the issue of employment the fact that Mrs. Carp produced valuable work for Dal-Tex, her activities in submitting drawings and designs for trims are clearly inconclusive as circumstantial evidence that she was therefore an authentic employee of Dal-Tex. Especially is this so when it · considered that the jury could have found that most of this was done prior to the asserted employment. Similarly, as will be noted below, the documentary proof in support of a finding of employment is far from compelling, and the issue of its authenticity was directly raised during the trial.

The defendant presented no witnesses directly contradicting the testimony that Mrs. Carp had been hired by Dal-Tex and entered on its payroll as a bona fide employee. Direct contradiction is not necessary, however, to present the issue of the credibility of that testimony or to permit its rejection by the jury. From the improbability of so much of the plaintiff's evidence as revealed by the contradictions among his own witnesses and the flaws in his case revealed by cross-examination, a fact-finder could conclude that the assertions

necessary to support the appellant's recovery were unworthy of belief.

Contrasted, for example, with the impression of authority sought to be created by the testimony concerning Mrs. Carp's supervisory duties, is evidence from which the jury was free to find that the supervisory and decision making authority over all the facets of this phase of the business was firmly established in the hands of Greenberg and Mack Gerlich, the president of the Blue Ribbon Optical Company and continued to reside there despite Mrs. Carp's short association with Dal-Tex.

Quite apart from the question whether the function of "overseeing the trim made like the design" can, in these circumstances, properly be classified as a supervisory one and disregarding the possible impeaching effect of a comparison of this ultimate claim of supervisory authority with the other references to Mrs. Carp's duties appearing in the record, the issue of credibility is directly raised by the absence from the record of any evidence showing that she fulfilled the requirements of even this modest job description. There is no testimony offered from which it could be inferred that Mrs. Carp participated in the evaluation of the designs or the finished trims at any stage of their production. With respect to the intermediate handling of the designs preparatory to their actual manufacture, nothing was done except upon specific instructions from Greenberg or upon the basis of what had been established as customary procedure between him and the Blue Ribbon Company. Whenever designs were to be submitted to Mack Gerlich, either from Dallas or from Mrs. Carp in New York, Greenberg always informed Gerlich that they were coming and no samples were produced by Gerlich except with Greenberg's approval. The evaluation of the samples was accomplished either by Greenberg or Gerlich. When any number was unsatisfactory it was either dropped or returned to Mrs. Carp for reworking. In such cases, the designs were always sent back with instructions to Mrs. Carp concerning the specific de-

fect that was discovered. On two occasions, moreover, the record shows that a revision of Mrs. Carp's designs was accomplished by Gerlich without consulting her at all.

Greenberg's testimony is additionally impeached on this subject by his admission of a complete lack of personal knowledge of what Mrs. Carp actually did. Although president of the company, he never saw her nor spoke with her personally or on the telephone. His conception of her duties was developed entirely in his conversations with Dr. Carp or the personnel at Dal-Tex. No correspondence supports his testimony. His insistence that she was fulfilling his conception of her function is founded only on his inference to that effect from the fact that finished trims originating from her designs were actually produced. The record on the other hand permits the conclusion that the duties which he inferred that Mrs. Carp was doing, were actually being performed by Greenberg himself.

Finally on this point, the jury could consider the testimony of Mack Gerlich, the only witness who dealt directly with Mrs. Carp. His only transactions with her involved the receipt of designs for trims. He saw her only twice, although he testified that he had also received some drawings from her in the mail. Both times were before the end of 1954 and thus before the alleged employment, and on each occasion they briefly discussed drawings which she had with her. Gerlich's testimony corroborates the other evidence of record that he worked under the direction of Greenberg with whom he participated in the evaluation of the designs. There is nothing in his testimony that Mrs. Carp handled anything but the preparation of drawings under their direction. As Gerlich testified:

"Q. Mr. Gerlich, who instructed you as to your relations that you were to have with Mrs. Carp? A. The first time I heard about her was from Mr. Greenberg.

"Q. What did he instruct you to do? A. He told me that whether he or she would send me drawings to *look at them* and *see if they will fit the frames* that he is using, *to dress them up from that point on*, and *to make him samples.*" (Emphasis added.)

Without undertaking to examine the testimony in greater detail, it seems clear that from it the jury concluded that the claims concerning Mrs. Carp's function with Dal-Tex made on the appellant's behalf were highly overstated.

The jury also was free to reject the plaintiff's documentary proof as evidence of a genuine employment relation. The Form W–2, for example, is not required to be submitted until after the close of the year to which it applies and is therefore no evidence of official action taken before Mrs. Carp's death. The compensation record identified by Muller is likewise inconclusive. Most damaging of all to the plaintiff's case, however, is the physical evidence of the check book from which the three semi-monthly pay checks for Mrs. Carp for her short alleged period of employment were drawn. If this check book can be read as a current account of what transpired with respect to the transactions recorded therein, it shows a number of transactions occurring both before and after the date of the three pay checks to Mrs. Carp all as having accrued before the three checks dated Feb. 15, Mar. 1 and Mar. 15 were issued. When this is viewed in light of the testimony that the checks were never received by the payee during her life, but were first seen by her daughter, who testified that they all came in a letter addressed to her mother, *"probably* on the 16th or 17th at the latest," (she died on the 16th) together with the statement by the bookkeeper that he had "overlooked" giving her the first check when due, which he later made out, he said, on March 1, but dated back to February 15, we think the jury could believe that all three checks were made out after Mrs. Carp's death, and mailed after that event. Other relevant evidence which would bolster such a belief was the fact that these checks did not come out of the payroll account from which all other em-

ployees were paid; they were charged to cost of goods sold; the three checks have successive printed numbers although dated at two-week intervals; the checks purported to be endorsed by the deceased rather than by a personal representative (giving the impression that they had been received during her life) although her daughter actually endorsed them by printing her mother's name.

We do not deem it necessary to comment further on the state of the record. Credibility, one of the main issues for the jury to determine, is of course peculiarly within its domain. We have simply attempted to emphasize factors in the record which make it plain, even without the opportunity to observe the witnesses at the trial, that there is evidence from which the jury could conclude that Mrs. Carp was never actually a full-pay employee of the Dal-Tex Company and therefore has failed to meet the requirements of the defendant's policy.

We have carefully considered the other asserted grounds of appeal but do not find any prejudicial error in the actions of the trial court.

The judgment is affirmed.