IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 96-30570

———————————

CENTRAL STATES, SOUTHEAST
AND SOUTHWEST AREAS PENSION
FUND, a pension trust; and
MARION M. WINSTEAD; R. JERRY
COOK; HOWARD MCDOUGALL; ROBERT
J. BAKER; R.V. PULLIAM, SR.;
ARTHUR H. BUNTE, JR.; HAROLD D.
LEU, present trustee, and
RAYMOND CASH, present trustee,

                                   Plaintiffs/Appellants/Cross-
                                                    Appellees,


versus


CREATIVE DEVELOPMENT COMPANY,
a Louisiana Partnership, TERRY
SMITH, partner; SANDRA THERIOT
SMITH, partner; JACK ROME, JR.,
partner; SUZANNE MCCRAINE ROME,

                                   Defendants/Appellees/Cross-
                                                   Appellants.



———————————

Appeals from the United States District Court
for the Middle District of Louisiana

———————————

November 1, 2000

Before HIGGINBOTHAM, WIENER, and DENNIS, Circuit Judges.

WIENER, Circuit Judge.

     Plaintiffs/Appellants/Cross-Appellees Central States, South-

east and Southwest Areas Pension Fund, a multiemployer pension

fund, and its trustees (collectively "Central States"), appeal from the district court's judgment that dismissed Central States's pension plan withdrawal liability claims against Defendants/Appellees/Cross-Appellants Creative Development Company ("Creative Development"), a Louisiana partnership, and its partners,, Terry Smith, Sandra Theriot Smith, Jack Rome, Jr., and Suzanne McCraine Rome.[1] Disagreeing with the district court as a matter of law, we conclude that a written agreement ("the 1986 Agreementv) unambiguously provided for and effectuated the transfer of a capital interest in Creative Development to Sheldon Beychok, the majority owner of a different business organization which had ceased making pension fund contributions to Central States. We therefore reverse the district court's judgment for Creative and remand for the limited purpose of affording that court the initial opportunity to determine whether, by virtue of such acquisition of a capital interest in Creative Development, Beychok (either alone or in combination with appellee Jack Rome, Jr.) owned both a "controlling interest" and "effective control" of each business, within the intendment of the Employment Retirement Income Security Act ("ERISA")[2] as amended by the Multiemployer Pension Plan Amendment Act ("MPPAA"),[3] thereby placing Creative Development and

---

[1]    Hereafter, Creative Development and its partners are sometimes referred to collectively as "Creative."

[2]    29 U.S.C. § 1001 et seq.

[3]    29 U.S.C. §§ 1381 - 1453.

2

Beychok's other business organization under "common control"[4] and subjecting Creative to responsibility for the other business's "withdrawal liability" to Central States.

I.

BACKGROUND

A. Statutory Framework

Central States is a multiemployer pension plan within the meaning of §§ 3(37) and 4001(a)(3) of ERISA.[5] Central States brought this suit to recover "withdrawal liability" from Creative Development and its individual partners under MPPAA. The term "withdrawal liability" refers to the share of unfunded vested benefits, i.e., the difference between the present value of a pension plan's assets and the present value of the benefits it will be obligated to pay in the future, that an employer owes to a multiemployer pension plan governed by ERISA when the employer "withdraws" from the plan.[6] An employer is deemed to have withdrawn from a multiemployer pension plan when the employer "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the

_____

[4]    Id.

[5]    29 U.S.C. §§ 1002(37) and 1301(a)(3).

[6]    29 U.S.C. § 1381(a)("If an employer withdraws from a multiemployer plan..., then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability.").

3

plan."[7] ERISA imposes withdrawal liability on an employer in these situations to ensure that "the financial burden of his employees' vested pension benefits will not be shifted to the other employers in the plan and, ultimately, to the Pensin Benefit Guaranty Corporation, which insures such benefits."[8]

When an employer officially withdraws from a multiemployer pension plan, the plan sponsor must then (1) determine the amount of the employer's liability, if any, (2) notify the employer of this amount, and (3) collect the sum from the employer.[9] If the withdrawing employer is unable to pay its assessed withdrawal liability in full, the plan may recover the deficiency from other entities that are "trades or businesses" under "common control" with the withdrawing employer.[10] Consequently, all such trades or businesses, including the withdrawing employer, that are determined to be under "common control" within the meaning of MPPAA and its

_____

[7]    29 U.S.C. § 1383(a).

[8]    Central States, Southeast and Southwest Areas Pension Fund v. Slotky, 956 F.2d 1369, 1371 (7th Cir. 1992).

[9]    29 U.S.C. § 1382.

[10]    29 U.S.C. § 1301(b)(1)("For purposes of this title, under regulations prescribed by the [Pension Benefit Guaranty C]orporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer.")(emphasis added); see also Central States Pension Fund v. Personnel, Inc., 974 F.2d 789, 792 (7th Cir. 1992) (citing Board of Trustees of Western Conference of Teamsters Pension Trust Fund v. Lafrenz, 837 F.2d 892, 893-94 (9th Cir. 1988)).

4

regulations, are deemed to belong to a "controlled group" of trades or businesses and are treated as a "single employer." As such, all are jointly and severally (solidarily) liable for the withdrawal liability incurred by any member of the controlled group.[11] This form of liability is commonly referred to as "control group" liability.[12]

The determination whether particular entities are in fact controlled group members requires resort to several Treasury Department regulations, among which is one that specifies that a trade or business belongs to a "brother-sister" controlled group if:

> (i) the same five or fewer persons who are individuals, estates, or trusts own...a controlling interest in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization.[13]

In the case of a trade or business that is a partnership, a "controlling interest" means "ownership of at least 80 percent of the profits interest or capital interest of such partnership,[14] and

---

[11] Central States, Southeast and Southwest Areas Pension Fund v. Koder, 969 F. 2d 451, 452 (7th Cir. 1992) (citing Lafrenz, 837 F.2d at 893). The term "control group" is used interchangeably with the term "controlled group." For the balance of this opinion, we will refer to "controlled group," being the more commonly used term.

[12] Central States. Southeast and Southwest Areas Pension Fund v. Ditelo, 974 F.2d 887, 889 (7th Cir. 1992).

[13] 26 C.F.R. § 1.414(c)-2(c)(1)(emphasis added).

[14] 26 C.F.R. § 1.414(c)-2(b)(2)(i)(C)(emphasis added).

5

"effective control" exists when five or fewer persons "own an aggregate of more than 50 percent of the <u>profits interest</u> or <u>capital interest</u> of such partnership.[15]

In this case, a Baton Rouge, Louisiana bakery business known as Wolf Baking Co. Inc. ("Wolf Baking") had been a signatory to a collective bargaining agreement ("CBA") pursuant to which Wolf Baking was required to make contributions to Central States. In December 1986, Wolf Baking filed for bankruptcy and discontinued its operations, thereby permanently terminating its obligation to make contributions to Central States. As a result, Wolf Baking was deemed to have withdrawn from Central States. Accordingly, Central States calculated Wolf Baking's withdrawal liability and determined it to be $1,352,710.73. Because of its bankruptcy, however, Wolf Baking was able to pay only $289,858 of this obligation to Central States, leaving a deficit in excess of $1 million. Central States now seeks to recoup the Wolf Baking shortfall through a withdrawal liability assessment and recovery against the partnership and the individual partners comprising Creative, asserting that the partnership was, at all pertinent times, a member of a brother-sister controlled group with Wolf Baking. This, Central States posits, resulted from the three-cornered transaction among (1) Wolf Baking and its affiliates, (2) Beychok, individually, and (3) Creative Development, as formalized in the 1986 Agreement.

---

[15]    26 C.F.R. § 1.414(c)-2(c)(2)(iii)(emphasis added).

B.   The Brother-Sister Entities:   Creative Development and the Bakeries

Creative Development was formed as a Louisiana partnership in 1981 by the above-named individual appellees to develop a residential subdivision near Baton Rouge.  The initial capital of the partnership was $5,000, consisting of equal contributions from the founding partners.

In the same year, 1981, W.B.C. Inc. ("WBC") was formed by Sheldon Beychok, now deceased, appellee Jack Rome, and Harold Salmon, Jr., to acquire the stock of two bakeries that had recently emerged from bankruptcy.  One of those bakeries was Wolf Baking; the other was Wm. Wolf Bakery, Inc. ("Wm. Wolf Bakery").  At all times relevant to this case, those two bakeries were wholly owned subsidiaries of the holding company, WBC.[16]  Furthermore, at all relevant times, Sheldon Beychok and appellee Jack Rome collectively owned 85 percent of the issued and outstanding capital stock of the holding company, WBC, with Beychok owning 61.45 percent and Rome owning 23.55 percent.[17]  Thus, Beychok and Rome, through their controlling interest in the parent corporation, WBC, owned or controlled more than 80 percent of the capital stock of its Wolf Baking and Wm. Wolf Bakery subsidiaries — actually, 100 percent

---

[16]   Hereafter WBC and its wholly owned subsidiaries, Wolf Baking and Wm. Wolf Baker, are sometimes referred to collectively as "the bakeries."

[17]   As of December 1986, the remaining 15 percent of WBC's outstanding stock was owned by Harold Salmon, Jr. (10 percent) and Robert Sehring (5 percent).

control by virtue of their combined 85 percent control of WBC, which owns 100 percent of the stock of each subsidiary.

During the mid-1980s, the wholly owned subsidiary bakeries of WBC were chronically in need of cash, so Beychok made loans to each from time to time. By June 1, 1986, the outstanding balance of these loans aggregated $324,000.

C. Creative Development's Initial Involvement with the Bakeries: The Sale and Leaseback of the Bakery Depots

For a better understanding of the 1986 transaction, which is at the vortex of the dispute in this case, we briefly review how Creative Development first became directly involved with the bakeries and Beychok. In the early 1980s, after completion of the real estate venture for which it was originally formed, Creative Development decided to invest in two "bakery depots"[18] owned by Wm. Wolf Bakery. In March 1982, Creative Development purchased the two bakery depots for a price of $250,000, then immediately leased both depots to Wolf Baking "and/or its affiliates." Beychok —— who, with Harold Salmon, had previously purchased two other bakery depots from Wm. Wolf Bakery —— confirmed that the purpose of this March 1982 sale to Creative Development was to obtain cash for injection into Wolf Baking and its affiliates so that the bakeries could continue to operate.

---

[18] A "bakery depot" is a drop-off point for the localized distribution of bread and bakery products.

8

The financing for Creative Development's 1982 purchase of the bakery depots came from two sources: (1) cash, obtained from a $200,000 loan from River City Federal Savings & Loan ("River City"), evidenced by Creative Development's promissory note, which was secured by a first mortgage on the depot properties, and (2) credit, evidenced by an unsecured $50,000 purchase money promissory note given by Creative Development to the vendor, Wm. Wolf Bakery.

As an additional, inducement for Creative Development to purchase the two depots, Beychok agreed to become a party to the depot leases and personally guarantee the lease payments to Creative Development. In consideration for Beychok's becoming a party to and personally guaranteeing the leases,[19] Rome and Smith executed a counter letter to Beychok, acknowledging that in truth Creative Development owned only an undivided two-thirds (2/3) interest in the two depots purchased from Wm. Wolf Bakery and that the remaining one-third (1/3) interest was purchased for the account of Beychok. The counter letter further declared that Rome and Smith would, when called upon to do so, transfer record title to Beychok of his undivided one-third (1/3) interest in the depots.

Creative Development's purchase of the two bakery depots in March 1982, coupled with the provisions of the counter letter, produced a joint venture between Creative and Beychok. Subsequent

---

[19] In addition to being a surety of the obligations of the bakeries on the lease, Beychok was also a guarantor on the note to River City.

9

financial statements and tax returns prepared for or filed by the Romes, the Smiths, Creative Development, and the Creative/Beychok joint venture, reflect Creative's two-thirds (2/3) and Beychok's one-third (1/3) ownership interests in this depot venture.

D.   The 1986 Transaction

By the spring of 1986, Rome and Beychok knew that WBC's subsidiary bakeries were headed for bankruptcy and that as a result Beychok, an insider, would never recover the $324,000 owed to him by the bakers.  The parties also knew that the $50,000 promissory note given by Creative Development to Wm. Wolf Bakery as the credit portion of the partnership's purchase of the bakery depots was still outstanding and would become an asset of the bankruptcy estate of the bakeries.

In an apparent effort to "save" Creative Development's $50,000, the bakeries' bankruptcy counsel suggested that these two debts be offset to the extent possible and that the transaction be disclosed to the bankruptcy court.  Accordingly, at Rome's request, Beychok caused the 1986 Agreement to be prepared.  It was signed on June 1, 1986 by Terry Smith (on behalf of Creative Developemnt), Jack Rome (as President and CEO of Wm. Wolf Bakery, Inc. and Wolf Baking Company, Inc.) and Sheldon Beychok, individually.  In the 1986 Agreement, the parties first acknowledged the existence of (1) Creative Development's $50,000 promissory note owed to Wm. Wolf Baker, and (2) the bakeries' cumulative debt of $324,000 owed to Beychok.  The parties then agreed to the following:  (1) <u>Beychok</u>

10

authorized the bakeries to reduce the amount of their $324,000 indebtedness to him by $50,000; (2) the bakeries, in turn, agreed to credit the indebtedness owed to them by Creative Development by the same amount ($50,000), "forever extinguishing the obligation [on the promissory note] from Creative to Wolf and/or Baking Company"; and (3) Creative agreed that it

> does hereby sell, transfer and assign unto Beychok an interest in that partnership [Creative] equal to said Fifty Thousand ($50,000) Dollar offset as described hereinabove. (emphasis added).

The legal effects of this round robin transaction comprise the crux of the threshold issue of the instant litigation: whether Sheldon Beychok, the now-deceased former majority owner of WBC and its subsidiaries, acquired a capital or equity interest in Creative Development as a result of the 1986 transaction, or merely became its creditor. If Beychok acquired a capital interest and such interest, either alone or in combination with Rome's, equaled or exceeded the minimum percentages needed to constitute "controlling interest" and "effective control" for purposes of the relevant Treasury Regulation,[20] then Creative Development and the bakeries would have been under "common control," i.e., members of the same brother-sister group of trades or businesses under the common control of Rome and Beychok. As such, Creative would be liable to

---

[20]     26 C.F.R. § 1.414(c)-2.

11

Central States under MPPAA.[21] If, however, Beychok merely became a creditor of the partnership, no such liability would attach.

As shall be seen in the analysis that follows, this case turns on the answers to three questions: (1) Is the subject provision of the 1986 Agreement ambiguous?; (2) regardless of whether that provision is ambiguous, what is the nature of the "interest" acquired by Beychok in Creative Development by virtue of the 1986 Agreement?; and (3) if the interest Beychok acquired was capital and not debt, does Beychok's percentage of capital interests, or the combined percentage interests of Beychok and Rome, in both Creative Development and the bakeries meet the two-pronged test for "common control" under the applicable Treasury Regulation?[22]

## II.

## PROCEEDINGS

Central States filed the instant action in September 1992, alleging that Wolf Baking and Creative Development constitute a controlled group and should be treated as a single employer for, purposes of assessing and recovering withdrawal liability under MPPAA. The district court denied cross notions for summary judgment, finding that the 1986 agreement was ambiguous, and that further inquiry into the intent of the parties was required. After a one day trial, the district court reaffirmed its earlier

---

[21]   29 U.S.C. §§ 1381–1453.

[22]   26 C.F.R. § 1.414(c)-2.

12

determination that the 1986 Agreement is ambiguous. The court then held, based on extrinsic evidence, that the 1986 Agreement was entered into solely to make Beychok a $50,000 creditor of Creative Development which, to that extent, simply replaced the bakeries as Beychok's debtor. The court concluded that Beychok neither became a partner nor acquired a capital interest in Creative Development but merely became its creditor. Accordingly, judgment was entered for Creative, dismissing Central States's claims at its costs. As it decided the case on that reasoning, the district court never reached the questions of common control or controlled group liability for purposes of assessing withdrawal liability.

Victorious, Creative filed a motion urging the district court to amend its judgment to include an award of costs, expenses, and attorneys' fees under ERISA.[23] The district court considered the factors affecting entitlement to such an award and held that it would not be appropriate. Central States timely appealed from the district court's judgment dismissing the withdrawal liability claims against Creative, and Creative cross-appealed from the district court's denial of its request for costs, expenses, and attorneys' fees.

III.

ANALYSIS

A.    Standard of Review

_____

[23]    See 29 U.S.C. §§ 1132(g)(1) and 1451(e).

13

The principal thrust of Central States's contention on appeal is that the district court erred in finding the language of the 1986 Agreement to be ambiguous on the question whether Beychok acquired a capital ownership interest in Creative Development or merely became its creditor. A district court's interpretation of a written agreement, including its initial determination whether that agreement is ambiguous, presents questions of law and thus is subject to our de novo review.[24] Findings of historical or discrete facts are reviewed for clear error.

B.  The 1986 Agreement Was Not Ambiguous and Conveyed a Capital Interest in Creative Development to Beychok

Central States insists that the meaning of the 1986 Agreement among Beychok, Creative Development, and the bakeries, is plain: Beychok acquired a capital interest in Creative Development; any other reading simply disregards what the 1986 Agreement actually says. Central States argues that the transaction conveyed to Beychok an equity or "capital" interest in Creative Development equal to $50,000, thus giving Beychok and Rome a combined capital or asset interest in that partnership of more than 80 percent. As together Rome and Beychok also owned more than 80 percent of WBC and thus of its Wolf Baking subsidiary, concludes Central States, a combined ownership interest of 80 percent or more of Creative Development placed Rome and Beychok in "common control" of both

---

[24]  See Louisiana Land and Exploration Co. v. Offshore Tugs, Inc., 23 F3d 967, 969 (5th Cir. 1994); American Totalisator Co., Inc. v. Fair Grounds Corp., F.3d 810, 813 (5th Cir. 1993).

14

businesses.  This in turn subjected Creative Development and its partners to solidary liability for the remainder of Wolf Baking's withdrawal liabiity under MPPAA.[25]

Creative, of course, rejects this view of the transaction memorialized in the 1986 Agreement.  Creative insists that the district court correctly determined, vis-à-vis Beychok, the transaction amounted to nothing more than an exchange of debtors —— Creative Development for the bakeries —— on the $50,000 owed to him.  As such, Beychok was substituted for the bakeries as the $50,000 creditor of Creative Development; in essence, Beychok only made a loan to, and became a creditor of, Creative Development.  This, asserts Creative, precludes the possibility that Creative Development and Wolf Baking were under common control.

After carefully reading the 1986 Agreement as a whole and giving its words their generally prevailing meaning,[26] we agree with Central States's position to the extent that it characterizes the 1986 Agreement as unambiguously transferring a capital interest in Creative Development to Beychok, albeit without admitting him as a partner.  We therefore conclude that, as this interpretation does

---

[25]    See 29 U.S.C. § 1301(b)(1) and 26 C.F.R. § 1.414(c)-2(c).

[26]    See LA. CIV. CODE ANN. art. 2050 (West 1987)("Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.")(emphasis added) and LA. Civ. Code Ann. art 2047 (West 1987)("The words of a contract must be given their generally prevailing meaning.").

15

not produce any absurd consequences, it must be given effect without resort to extrinsic evidence.[27]

"A contract is not ambiguous merely because the parties disagree upon the correct interpretation.[28]  In determining the presence of ambiguity vel non, we both parse the provision in question and construe that provision in the context of the entire document.  The particular provision of the 1986 Agreement that we examine for ambiguity today states:

> Creative does hereby sell, transfer, and assign unto Beychok
> an interest in that partnership [Creative] equal to said Fifty
> Thousand ($50,000) Dollar offset as described hereinabove.
> (Emphasis added).

The functional purpose of this provision is to identify the consideration that Beychok received from Creative Development in

---

[27]  See American Totalisator, 3 F.3d at 813; La. Civ. Code Ann. art 2046 (West 1987)("When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.")(emphasis added).

[28]  D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N. Amer., 957 F.2d 196, 199 (5th Cir. 1992); Wards Co. v. Stamford Ridgeway Assocs., 761 F.2d 117, 120 (2d Cir. 1985) ("'A Court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings.'") (quoting Downs v. National Cas. Co., 146 Conn. 490, 494, 152 A.2d 316, 319 (1959)). See also Ideal Mut. Ins. Co. v. Last Days Evangelical Assoc., Inc., 783 F.2d 1234, 1238 (5th Cir. 1986)("As necessity is the mother of invention, so is ambiguity the father of multiple reasonable constructions, and where lawyers are involved, one never lacks an eager parent of either gender.").

16

exchange for the bakeries' cancellation of the $50,000 debt theretofore owed to them by that partnership. As noted, that cancellation by the bakeries was made possible by Beychok's $50,000 reduction of the $324,000 then owed to him by the bakeries.[29]

In endeavoring to determine whether the "interest in that partnership" that Creative expressly sold, transferred, and assigned to Beychok could have more than one sensible meaning and thus be ambiguous, we find it helpful to engage in that venerable deductive exercise known as the process of elimination. In so doing, we first identify all of the possible kinds of interests that the words themselves could conceivably refer to in the context

---

[29]    The district court characterized Beychok's role in the 1986 transaction as that of a friendly creditor who gratuitously exchanged one debtor for another without "consideration." This conclusion is erroneous in both fact and law. First, in Louisiana "consideration" has never signified an exchange of equivalents or quid pro quo but causa or cause. Particularly when, as in the 1986 Agreement, the contract is totally bereft of language of donative intent, then cause or consideration is akin to motivation. So, as a matter of law, the 1986 Agreement reflects the presence of consideration for Beychok and the other parties as well. Second, if we were to go beyond the plain language of the agreement regarding consideration, as did the district court, we would find that even Common Law consideration was present for Beychok. Apparently disregarded was the fact that Beychok was an undisclosed joint venturer with Creative Development in the bread depot purchase for which Creative Development's $50,000 note was given to the bakeries. If the note had remained in the ownership of the bakeries and become an asset of the bankrupt estate, Creative Development would have had to pay it to the trustee or the eventual holder, and Beychok would have owed one-third of that payment to Creative Development by way of contribution. So, not only did Beychok receive a $50,000 interest in a then-viable and —— by virtue of the elimination of its debt to the bakeries —— solvent partnership, he was instantly relieved of a $16,667 contribution obligation.

17

of the entire 1986 Agreement.  We then examine each such possibility to see if it withstands legal analysis and remains a sensible reading of the agreement.  If two or more of the possibilities remain viable, there is ambiguity; but if only one is left standing, there is no ambiguity.

Like the district court and the parties before us, we discern but three possibilities:  (a) membership as a partner in Creative Development; (b) debt owed by Creative Development to Beychok, or (c) an innominate financial interest (income, capital, or both) in that partnership, which interest is neither debt nor membership in the partnership.  We proceed to analyze each possibility in order.

### 1.  Beychok as a Partner in Creative Development

After the district court found the presence of ambiguity, it had no difficulty eliminating membership as a partner in Creative Development as one of the possibilities of the kind of interest that Beychok acquired.  And, on appeal, neither the appellants nor the appellees seriously urge that the 1986 Agreement admitted Beychok into Creative Development as a partner.  Clearly it did not.  As Creative correctly explains, under Louisiana partnership law (1) unanimous action by the parties is required to amend a partnership agreement for the purpose of admitting a new partner unless otherwise agreed,[30]  (2) neither the number nor the identity of the partners of Creative had changed since it was formed in

---

[30]    LA. CIV. Code ANN. art. 2807 (West 1994).

18

1981, and (3) the 1986 Agreement was not signed by or on behalf of all four partners qua partners.[31] In short, as the unanimous consent of the partners was not evidenced in the 1986 Agreement, then as a matter of law Beychok could not have been admitted as a partner.[32] Moreover, the phrase "interest in that partnership" clearly eschews the contention that the sale, transfer, and assignment of such an interest somehow admitted Beychok as a partner: Memberships in partnerships are not sold, transferred or assigned; rather, persons are "admitted" into partnerships or "made" partners. Obviously, then, the first of the three

---

[31] As noted earlier, the 1986 Agreement was not signed at all by Mrs. Rome or Mrs. Smith, and was signed by Jack Rome only on behalf of the bakeries; only Terry Smith signed on behalf of Creative Development.

[32] Central States's assertion that spouses cannot enter into partnership agreements, thus eliminating the necessity for the wives of Rome and Smith to have given their assent to the inclusion of Beychok as a partner in Creative, had been disposed of by the Louisiana legislature's 1980 revisions of the Civil Code articles governing matrimonial regimes. See LA. CIV. CODE arts. 2325-2437 (West 1985) and former LA. CIV. CODE art. 1790 of the 1870 Code, repealed by 1979 La. Acts. No. 711, § 1 (West 1972 Compiled Ed.). As leading commentators have noted, these revisions made it possible for spouses to contract with each other with virtually no impediments and thus permit spouses to enter, inter alia, partnership agreements. See Katherine S. Spaht & W. Lee Hargrave, 16 Louisiana Civil Law Treatise § 8:10, at 395 & 398 (West 1989). In addition, Mrs. Rome did not sign and her husband did not sign as a partner of Creative Development, but solely as an executive of the bakeries, the interests of the Romes in Creative Development were not represented at all in the 1986 Agreement.

19

possibilities —— membership in Creative Development —— must be eliminated.[33]

## 2. Beychok as a Creditor of Creative Development

Differing with the district court, we hold as a matter of law that, whether read "in a vacuum" or in context of the entire 1986 Agreement, the above quoted contractual provision neither transferred to Beychok the old promissory note that Creative Development had given to the bakeries in connection with acquisition of the bread depots nor created a new debt owed by Creative Development to Beychok. First, only the bakeries, as payee and holder of the old promissory note, had the legal capacity to transfer it, yet there is no record evidence, much less any provision in the agreement, reflecting such a transfer by the bakeries. Conversely, Creative Development was the maker of the old note, not the payee or the holder, so it had no legal capacity to transfer the note. In fact, the 1986 Agreement states that it "expressly extinguished" the obligation, which under Louisiana law

---

[33] The choice of the phrases, "sell, transfer and assign," and "interest in that partnership" cannot be ascribed to inadvertence or sloppiness in drafting the 1986 Agreement. We take judicial notice of the fact that the attorneys who represented all parties to the 1986 Agreement enjoy superlative reputations in the Baton Rouge and State bars in the fields of commercial transactions in general, and both bankruptcy and partnership law in particular. Indeed, we speculate that the language was carefully chosen in an effort to avoid any possibility of Beychok's being deemed to be either a partner in Creative Development or a creditor of that partnership.

voids the note as well.  Thus, neither the bakeries nor Creative ever purported to transfer or assign the old Creative Development note to Beychok.

Second, there is neither record evidence nor any language in the 1986 Agreement to indicate that a new or replacement note was made by Creative when that agreement was executed.  There is simply no evidence that a new note was issued and made payable either to Beychok or to "Bearer," then delivered to Beychok.

Absent express transfer or assignment of the old note or creation and delivery of a new note, only the above quoted language of the 1986 Agreement itself remains as a potential candidate for evidencing the creation or acknowledgment of debt owed by Creative Development to Beychok or the transfer or assignment to Beychok of an old debt owed by Creative to the bakeries.  Yet absolutely nothing in that provision sounds in debt.  Elsewhere in the 1986 Agreement the parties correctly employed such terms as "indebtedness," "loan," "debt," and "obligation," and did so with the professional facility we would expect of learned counsel who drafted it, thereby confirming the understanding of these terms and concepts by the parties and their scrivener.  Unlike other portions of the 1986 Agreement, the particular provision that we now review for ambiguity employs none of these terms of indebtedness.  In fact, none of the traditional objective indicia of a loan or credit

relationship are anywhere to be found in the subject provision.[34] Notably, there is (1) no reference to a promissory note representing the purported loan or credit obligation, (2) no maturity date for the purported loan, (3) no provision for repayment of the purported loan, (4) no specification of a rate of interest or a way to calculate it, (5) no reference to a due date or "payment on demand," and (6) no provision concerning default. Perhaps most significantly, the subject provision of the 1986 Agreement contains no stipulation that, in the event of termination or liquidation of the purported debt, assets of that partnership would be paid to Beychok as a creditor in preference to monies due to its partners. The complete absence of these objective indicators of a debtor-creditor relationship far outweighs the subjective testimonial evidence proffered by Creative — and relied on by the trial court — to support the contention that the transaction's purpose was to convey an old creditor's interest or create a new one.[35]

---

[34] See Texas Farm Bureau v. United States, 725 F.2d 307, 311 (5th Cir. 1984), cert. denied, 469 U.S. 1106 (1985)(tax case setting forth a number of factors, largely objective, that may be usefully considered in resolving debt-versus-equity controversies); Retirement Benefit Plan v. Standard Bindery, Co., 654 F. Supp. 770, 772-73 (E.D. Mich. 1986)(applying traditional debt/equity factors to resolve debt/equity controversy in an MPPAA withdrawal liability case).

[35] Creative has urged that if our inquiry were to venture beyond the four corners of the Agreement, we should follow the Eleventh Circuit's decision in Conners v. Ryan's Coal Co., Inc., 923 F.2d 1461 (11th Cir. 1991), which states that "[t]he true focus of the inquiry [into whether a business relationship qualifies as a

Furthermore, were we to have found ambiguity and considered extrinsic evidence, we would be compelled to observe the presence of four sworn documents, executed respectively by Jack Rome, Beychok and Rome, the bakeries' bankruptcy counsel, and Wolf Baking's comptroller, each of which was prepared for admission in various bankruptcy proceedings, and all of which uniformly state that Beychok was either a partner in or an owner of Creative Development. This is far too uniform and consistent to be explained away by press of the lawyers' business. As a minimum, this independent sworn documentation would cast serious doubt on the subjective, self-serving testimonial evidence relied on by Creative and the district court to support the conclusion of debt, and would further support our conclusion that the 1986 Agreement was not intended to transfer a note to Beychok or to create a

_____

partnership for purposes of assessing withdrawal liability] must be on whether the alleged partners really and truly intended to join together in the present conduct of the enterprise." Id. at 1467 (emphasis added). The Eleventh Circuit went on to say, however, that parties' intention with respect to the formation of a partnership "may be determined with reference to an express agreement or from the circumstances surrounding the purported partnership agreement." Id. (emphasis added). Notwithstanding that under ERISA, Central States need not prove that Beychok became a member of Creative Development (see infra text accompanying notes 43 and 44), here the 1986 Agreement and the circumstances surrounding its confection —— principally the absence of any objective indicia of a debtor-creditor relationship —— indicate that the parties "truly intended" for Beychok to acquire a capital interest in Creative.

debtor-creditor relationship between Beychok and the partnership.[36] It follows inescapably that, like membership in Creative Development, debt too must be eliminated as the type of consideration that Beychok received in the transaction memoralized by the 1986 Agreement.

   3.   Beychok as the Owner of a "Capital Interest" in Creative Development

Having determined that the "interest in that partnership" sold, transferred, and assigned to Beychok was neither membership for him in Creative Development nor debt owed to him by that partnership, all remains to be done is to identify precisely what interest Beychok did acquire from Creative Development in the 1986 transaction, and whether identifying the interest as such would lead to "absurd consequences."[37]

Creative takes the position that the process of elimination supports the district court's determination that the "interest"

---

[36]   When the 1986 Agreement was confected in June, there was no short fuse or mad scramble to rationalize the absence of debt terminology —— the excuse proffered for the references to Beychok as a partner in bankruptcy documents. And, despite the district court's reliance on the shaky extrinsic evidence, even it depicts the financial vice-president of Creative Development testifying that Beychok had an interest in Creative Development, and neither Rome nor Beychok unequivocally denying that Beychok had an interest in the partnership —— only that he was not a partner, thus begging the question. Even if the extrinsic evidence were admissible, the conclusion of the district court made in reliance on it —— in the face of all other testimony and documentation —— would be clearly erroneous to the extent it characterized Beychok's interest as that of a creditor.

[37]   LA. CIV. CODE ANN. art. 2046 (West 1987).

Beychok received was that of a creditor. Creative does so first by eliminating the possibility that the Agreement made Beychok a partner (with which we and the district court —— and, presumably, Central States —— all agree). But Creative then asserts that, as a matter of state law, the "in that partnership" that Creative Development transferred to Beychok could not have been a capital interest. Creative insists that Louisiana law does not permit a non-partner to acquire and own a capital or equity interest in a partnership without first being or becoming a partner. In this contention Creative badly misapprehends —— or consciously mischaracterizes —— Louisiana partnership law.

In a number of circumstances, Louisiana law does in fact permit persons who are not partners to acquire capital or equity interests in the partnership. Perhaps the most commonly encountered example occurs when a partner dies. Although the heirs or legatees of the deceased partner do not themselves become partners, they nevertheless do, in the absence of a contrary provision in the partnership agreement, "inherit the interest of the deceased partner, which entitles them to be paid as provided in Civil Code Article 2823 et seq."[38] The same holds true in the instances of (1) a creditor who seizes the interest of a partner,

---

[38] LA. CIV. CODE ANN. art. 2818 rev. cmt. c (West 1994) (emphasis added); see also LA. Civ. CODE ANN. art. 2823 (West 1994) (The successor of a partner is "entitled to an amount equal to the value that the share of the former partner had at the time membership ceased.").

(2) a partner who voluntarily withdraws or is expelled from the partnership, and (3) a partner whose membership in the partnership terminates pursuant to provisions of the partnership agreement.[39] In each of these variations, there exists "an interest in the partnership" that has value and must be accounted for, even though the successor to such interest never was or has ceased to be a partner.

The point is even more vividly demonstrated by the situation contemplated in article 2812 which provides that "partner may share his <u>interest in the partnership</u> with a third person without the consent of his partners, but he cannot make [the third person] a member of the partnership...."[40] This code article, which follows the approach of the French Civil Code, recognizes that, "[i]n the absence of an express prohibition in the partnership agreement, a partner may associate a third person in his interest in the partnership [even though] the association would not make the third person a partner."[41] And we are aware of nothing in Creative Development's partnership agreement that prohibits the total or partial sale, transfer, or assignment of an interest to a non-partner third person. Obviously, it would be sophistry for Creative to argue that a partnership cannot "transfer, and assign"

---

[39] See LA. CIV. CODE ANN. arts. 2818 and 2823.

[40] LA. CIV. CODE ANN. arts. 2812 (West 1994) (emphasis added).

[41] Id. rev. cmt.

26

that which can be alienated by a partner. Moreover, as such a disposition does not require admission of a new partner or amendment of the partnership agreement, nothing in the Louisiana Civil Code or the partnership agreement mandates unanimous consent of the partners.

In sum, these examples confirm that Louisiana partnership law anticipates and expressly provides for the possibility that a third person may acquire and possess (at least for a time) "an interest in a partnership" — capital or income or both — without being a partner. We are satisfied that our interpretation of the 1986 Agreement as unambiguously transferring to Beychok a capital interest in Creative Development (and conceivably, though unimportantly, an income interest as well) does not produce any consequences that are impossible under Louisiana partnership law or either nonsensical or absurd. Therefore this reading must be given effect without exiting the four corners of the 1986 Agreement to conduct further inquiry into the intentions of the parties.[42] It follows that the district court's resort to extrinsic evidence of intent was unwarranted and eventually led to reversible error in both methodology and substance.[43]

---

[42] See LA. CIV. CODE art. 2046; American Totalisator, 3 F.3d at 813.

[43] Even if the determination of ambiguity had not been erroneous and consideration of extrinsic evidence of intent had been admissible, we would have found the court's "debt" conclusion to be clearly erroneous.

C.    Withdrawal Liability

1.    Membership as a Partner is Not a Prerequisite

As a final observation in the circuitous and arcane route to the determination of withdrawal liability of all members of a controlled group, we underscore the truism that, to recover for withdrawal liability under MPPAA, an ERISA multiemployer pension plan need <u>not</u> prove that one who, with others, owns a "controlling interest" in, and exercises "effective control" over, a partnership that is one organization in a purported controlled group of trades or businesses, actually satisfies all of the state law requirements to be a partner in such partnership.[44]  Rather, all that MPPAA and its implementing regulations require is that such person own the requisite percentage of a "profits interest" <u>or</u> a "capital interest" in that partnership.[45]  As we have determined that the interest in Creative Development that Beychok acquired by virtue of the 1986 Agreement was a "capital interest" within the meaning of 26 C.F.R. § 414(c)-2, there can be no serious disagreement with the proposition that the interests of Beychok and Rome in both Creative Development and the bakeries are such that they must be tested to determine whether the requisite percentages — over 50 percent for "effective control" and 80 percent or more for the "controlling interest" — are present, irrespective of the fact that Beychok's

---

[44]    <u>See</u> 26 C.F.R. §§ 1.414(c)-2(c)(b)(2)(I)(c) ("controlling interest") and 1.414(c)-2(c)(2)(iii) ("effective control").

[45]    <u>Id.</u>

capital interest in Creative Development was not owned by him as a partner. If those capital interests are found to be present in such percentages, Creative Development and its partners cannot avoid solidary liability for the deficiency in the bakeries, withdrawal liability to Central States simply because Beychok was not a full-fledged partner in Creative Development.

If there are some who feel that controlled group rules produce unduly harsh results or set traps for the unwary, they should not turn a blind eye to all the facts that Rome and Beychok, as well as able counsel, knew or should have known when they confected the plan to salvage what they could from the impending bankruptcy of the bakeries. They had to have known, for example, that the bakeries (1) employed union labor, (2) were parties to a CBA, (3) were participating employers in a multiemployer pension plan pursuant to the CBA, (4) were approaching imminent bankruptcy, and (5) would, by virtue of bankruptcy, cease to participate in that multiemployer plan, leaving a substantial deficit in funding and thus withdrawal liability. As such, Rome, Beychok, and their counsel also knew or should have known that opting to confect and enter into the 1986 Agreement, which purposefully employed carefully crafted language that clearly eschews partner status for Beychok but just as clearly eschews debtor-creditor relationship between Creative and Beychok, was a high-risk endeavor. It amounted to flying perilously close to the flame that always burns brightly when super-majority interests in two separate entities are vested in five or less

29

individuals and one of those entities is a participating employer in a multiemployer pension plan.

Neither should the history of intertwined business dealings among Rome and Beychok and the organizations that they owned and controlled be disregarded. The 1986 Agreement was no chance encounter; these two businessmen had been in business with each other on a number of prior occasions, in both the bakery business and the real estate business. And on at least one occasion — the 1982 bakery depot transaction — both individuals as well as the bakeries, Creative Development, and the Smiths were directly involved. In hindsight, it may well prove to be regrettable for Creative if the tangled web they helped weave by confecting and entering into the 1986 Agreement, and possibly the bakery depot joint venture as well, ultimately traps its weavers. Yet that distinct possibility was — or at least should have been — a known risk.[46]

---

[46] Creative made an alternative argument which the district court never reached. First, Creative notes that following the 1982 sale and leaseback transaction involving the bakery depots, Central States demanded and obtained from Wm. Wolf Bakery a collateral mortgage position superior to Creative Development on its bakery depots, the express purpose of which was to secure payment to Central States of a portion of the bakery's pension contribution obligation. The documentation of this arrangement states that Creative Development would have no personal liability and that the security would provide Central States with only an in rem claim on the depot properties. Creative argues that Central States should be estopped from seeking to make Creative liable in personam in this action. But Creative's estoppel argument suffers from two fatal defects: (1) The release agreement was drafted and executed before withdrawal liability was triggered and assessed, and thus cannot be construed as releasing a claim that at the time was at

30

2.    <u>Render or Remand</u>?

Time and again in its briefs and post-argument submittals, Central States expresses or implies that <u>if</u> Beychok's $50,000 interest in Creative Development is found to be a <u>capital</u> interest and not a creditor's interest, the conclusion is foregone that Beychok and Rome together owned at least 80 percent of the capital interest in both Creative Development and the bakeries at the time in question, <u>and</u> that those two organizations would be under common control <u>per</u> <u>se</u>. Central States finds this same conclusion implicit in the district court's opinion as well. Even though at this juncture the presence of the "at least 80 percent" factor is irrefutable as to the bakeries, its presence is less than certain as to Creative Development.

More significant (and curious) is the observation that nowhere does Central States advert to the fact that the 80 percent

---

best inchoate and contingent, <u>see</u> 66 AM. JUR. 2D *RELEASE* § 33, at 710–11 ("A release which in terms covers only a present right will not be construed to discharge a demand which was then uncertain and contingent."); and (2) the text of the relevant document expressly released Creative Development from liability for "delinquent pension and health and welfare <u>contributions</u>" (emphasis added), not from withdrawal liability. The "contributions" referred to are simply an employer's ongoing, periodic payments to a pension plan trust on behalf of participant employees; withdrawal liability, on the other hand, is a well-defined term of art for an employer's pro rata, unfunded vested benefit obligation that is assessed under MPPAA <u>after</u> the obligation to make contributions has ended. Creative's release argument confounds these two obligations, even though the document at issue was only concerned with contributions, not withdrawal liability. Creative's estoppel claim that Central States release Creative from withdrawal liability fails.

31

"controlling interest" factor is but one of two prongs of the conjunctive test for "common control."[47] Although the 80 percent test determines "controlling interest," that is only one-half of the "common control" calculus.[48] The other half — "effective control" — is determined under the second prong of the test for common control in the brother-sister context.[49] For partnerships, "effective control" is defined as "an aggregate of more than 50 percent of the...capital interest of such partnership."[50] Importantly, this second, "effective control" prong takes into account the "ownership of each such person [singular] only to the extent such [person's] ownership is identical with respect to each such organization."[51] One need only consider the relevant example set forth in the regulation[52] to realize that the "effective control" prong of the common control test is no simple arithmetic

---

[47]    26 C.R.F. § 1.414(c)-2(b)(2).

[48]    "The term 'brother-sister group of trades or businesses under common control' means two or more organizations conducting trades or businesses if (i) the same five or fewer persons who are individuals . . . own . . . a controlling interest in each organization [first prong], and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control [second prong] . . . .  26 C.F.R. 1.414(c)-2(c)(1)(emphasis added).

[49]    Id.

[50]    26 C.F.R. § 1.414(c)-2(c)(2)(iii).

[51]    26 C.F.R. § 1.414(c)-2(c)(1)(ii)(emphasis added).

[52]    26 C.F.R. S 1.414(c)-2(e) Example (4).

32

exercise; after all, if it were, there would always be a "more than 50 percent" capital interest when the persons in question satisfy the controlling interest "at least 80 percent" prong of the test. But in the "effective control" second prong there is a tricky factor lurking just beneath the surface of the facially murky phrase, "only to the extent such ownership is identical with respect to each such organization...."[53]

The turbidity of that phrase, especially the operative word "identical," clears up considerably, however, when the "effective control" test is applied to actual examples. In this second prong test, the ownership of each person must be examined separately, focusing on one person's ownership in each organization under consideration to find his or her ownership only to the extent it is identical in each organization. Practical application of this test reveals, every time, that the identity of ownership for each person is the smallest percentage that he or she owns in any of the targeted organizations.

Purely for purposes of illustration, we will employ Central States's post-argument approach to ascertaining the percentages for Rome and Beychok, i.e., determining the percentages of capital ownership in Creative Development on the basis of the parties' respective capital contributions. Thus we begin this hypothetical example by assuming that, of the total capital contribution of

---

[53]     26 C.F.R. § 1.414(c)-2(c)(1)(ii).

$55,000,[54] Rome's $2,500 represented 4.545 percent and Beychok's $50,000 represented 90.9 percent.  As for the bakeries, it is undisputed that Rome's percentage of the stock in WBC was 23-55 percent and Beychok's was 61.45 percent.  In this example, then, Rome's "identical" ownership in the two businesses would be 4.54 percent, i.e., his percentage of ownership interest in the capital of Central States; the difference between that percentage and his larger percentage of ownership in the bakeries drops out as non-identical.  In like manner, Beychok's "identical" ownership in the two businesses would be 61.45 percent, i.e., his percentage of ownership interest in WBC; the difference between that percentage and his larger hypothetical percentage of ownership in Creative Development drops out as non-identical.

In this illustration, the "identical" ownerships of Rome and Beychok —— 4.54 percent for Rome and 61.45 for Beychok, for a total of 65.99 percent —— obviously satisfy the second prong, "effective control" test which only requires an aggregate of more than 50 percent.  Indeed, Beychok alone satisfies that test, as he is "five or fewer persons" and his "identical" ownership in each organization is more than 50 percent.

Additionally, in this hypothetical example, the first prong, "controlling interest" test for common control would be satisfied because the first prong examines seriatim the capital owners'

---

[54]    $2,500 from the Roses, $2,500 from the Smiths, and $50,000 from Beychok.

combined percentage in each separate trade or business. Based on his hypothetical 90.9 percent capital interest in Creative Development, Beychok alone would satisfy the "at least 80 percent of the...capital interest" test for the partnership. And together, Beychok's 61.45 percent and Rome's 23.55 percent of the stock of WBC, totaling 85 percent, would satisfy the "at least 80 percent" test of both the voting power and the total value of all shares of all classes in the bakeries.

As the district court concluded that the 1986 Agreement (which it found ambiguous) neither admitted Beychok into Creative Development as a partner nor conveyed "an interest in" Creative Development to him, but instead made him a creditor to the extent of $50,000, the court never reached or addressed the crucial MPPAA question whether separately or jointly Rome and Beychok had "controlling interest" in and "effective control" of both Creative Development and the bakeries. Moreover, the status of the record on appeal is such that — without engaging in substantial appellate fact finding regarding matters that at this juncture are not uncontested, stipulated, or otherwise clear beyond cavil — we cannot determine whether Rome and Beychok had controlling interest and effective control.[55] And, as we decline to engage in such

_____

[55] Following oral argument to this panel, Creative and Central States were asked to file joint stipulations that could have provided factual information sufficient for the panel to determine the elements of controlling interest and effective control. Regrettably, the parties failed in this cooperative effort, thereby depriving us of the opportunity to render a judgment and end this

35

inappropriate fact finding, we are not able to render a judgment in this case, one way or the other. Instead, we are constrained to remand it to the district court for the limited purpose of adducing the evidence that it needs to make such indispensable factual determinations and calculations.

Inasmuch as the governing regulation on this point expresses "controlling interest" and "effective control" in <u>percentages</u>,[56] the fundamental factual determination that the district court must make on remand is the percentage of the capital interest in Creative Development that Beychok owned at the time the bakeries "withdrew" from Central States. This will require the court to adduce sufficient evidence to enable it to convert Beychok's $50,000 capital interest into a percentage. More specifically, the court must first convert that dollar amount to a percentage as of June 1, 1986, and then find whether, between that date and the effective date of the bakeries' withdrawal from Central States, Beychok's percentage changed or remained the same. The district court must also ascertain the percentage of Rome's capital ownership in Creative Development as of the relevant time or times, presumably one-half of the figure derived by subtracting Beychok's percentage from 100 percent. Then, with those percentages firmly established, the court must proceed to determine whether Beychok and Rome (or

---

litigation.

[56]    26 C.F.R. § 1.414(c)-2(b)(2)(C) and (c)(2)(iii).

36

Beychok alone) owned at least 80 percent of the capital interest in the partnership for purposes of "controlling interest." Thereafter, taking into account Beychok's and Rome's respective ownerships "only to the extent such ownership is identical" in both the partnership and the bakeries, the court must ascertain whether those two individuals (or one of them alone) owned more than 50 percent of the capital interest — and thus "effective control" — in both Creative Development and the bakeries.[57]

Should the district court ultimately conclude that both prongs of the common control test are satisfied, it must then render a judgment assessing Creative's responsibility (and that of its partners) for the delinquency in the withdrawal liability owed by the bakeries to Central States. If, however, the court concludes that either prong of that test is not satisfied, it must render a judgment dismissing Central States's action against Creative and its partners.

In the interest of judicial economy and to avoid the need for another panel of this court to "reinvent the wheel" if either or

---

[57]    26 C.F.R. § 1.414(c)-2(c)(1)(ii) and (c)(2)(iii).  The court must also test the bakery depot joint venture's ownership against the bakeries as of the latter's withdrawal for the presence of "controlling interest" and thus controlled group status, once the percentage of Beychok's capital interest in Creative Development is determined.  Even though it appears counterintuitive that Beychok and Rome could fail to have controlling interest in Creative Development and the bakeries, while having a controlling interest in the joint venture and the bakeries, it is also counterintuitive that such a situation is beyond the realm of mathematical possibility, thus the need for testing.

both sides are so disappointed with the district court's findings and rulings on remand that they appeal, this panel retains appellate jurisdiction pending this limited remand to the district court. Consequently, regardless of whether or not the district court finds on remand that the required joint or aggregate percentages of "controlling interest" and "effective control" are sufficient to constitute "common control" and thus impose controlled group liability on Creative under MPPAA, any appellate review will be conducted by this panel.

IV.

CONCLUSION

The district court reversibly erred in holding that the 1986 Agreement was ambiguous, and it compounded the error by considering extrinsic evidence of the parties' intent and basing its judgment on that evidence. We conclude de novo that the 1986 Agreement was not ambiguous and that it conveyed a capital interest in Creative Development to Sheldon Beychok. Consequently, if in combination the interests of Beychok and Rome in both Creative Development and the bakeries are ultimately found to be sufficient to constitute Creative Development a member of the same controlled group of trades and businesses as Wolf Baking, then Creative Development and its partners, the Romes and the Smiths, will be liable in solido to Central States for the outstanding balance of Wolf Baking's withdrawal liability.

Only one facet of one prong of the two-prong common control test is discernible from the record on appeal: In both combined voting power and total value, Rome's and Beychok's shares of stock in WBC were sufficient to vest those two shareholders with a "controlling interest." Without engaging in inappropriate appellate fact finding, however, we cannot convert Beychok's dollar interest in Creative Development to a percentage interest. And without that indispensable piece of the puzzle before us, we are unable to determine whether Beychok's and Rome's combined capital ownership in Creative Development equaled at least 80 percent and thus constituted a controlling interest in that partnership. For the same reason, we are unable to determine the extent of either Beychok's or Rome's ownership interests in those two business organizations to the extent that they are "identical with respect to each," so we cannot say whether those two individuals had "effective control" of the bakeries and the partnership. It follows that neither we nor the district court can tell whether the two business organizations were under "common control" for purposes of MPPAA, a determination that is critical to either court's ability to decide whether Creative Development and its partners have solidary withdrawal liability to Central States.

Accordingly, we reverse the district court's judgment that dismissed Central States's withdrawal liability claims, and we remand the case to that court for the limited purpose of (1) determining the several ownership percentages required to test for

39

the presence of common control; (2) applying the percentages thus determined to both prongs of the common control test; and (3) if common control is found to have been present, assessing the quantum of Creative's withdrawal liability to Central States and rendering a judgment accordingly. In the interest of judicial economy, this panel retains appellate jurisdiction for the purpose of reviewing the determinations and judgment of the district court on remand, should the parties or any of then elect to appeal.

REVERSED and REMANDED with instructions; appellate jurisdiction retained by this panel.

DENNIS, Circuit Judge, dissenting:

I respectfully dissent because (1) the Central States plaintiffs failed to establish the necessary factual basis under Louisiana partnership law to prove that Terry Smith was authorized to amend the Creative partnership contract so as to change the proportionate share of each partner's capital interest and to transfer an interest in the capital of Creative to a third person; (2) under Louisiana law a partnership agreement is a simple contract, and the unanimous consent of the partners is required to amend the partnership contract; (3) the majority concedes that plaintiffs failed to prove that Terry Smith was authorized by unanimous consent of the Creative partners to act for them in his transaction with Beychok; (4) because an amendment of the partnership contract is required to change or affect any partner's capital or profit interest, Terry Smith was not authorized to grant or transfer to Beychok an interest in the capital of the Creative partnership; (5) under Louisiana law a partner may agree between himself and a third person to share that partner's interest in the partnership, but such an agreement cannot give the third person any interest in the partnership or affect the other partners' interests; and a partner's heirs, assigns, or seizing creditors are entitled to an amount equal to the value that the share of the former partner had at the time membership ceased; but, a third person cannot acquire, succeed to, or seize a partner's membership or interest in the capital of the partnership without amendment of the partnership

41

contract, which requires unanimous consent of the other partners; therefore, lacking unanimous consent of the partners to amend the partnership contract, Beychok could not acquire an interest in the capital of the partnership; (6) contrary to the majority's assumption, the federal laws and regulations do not consider that anyone other than a partner has an interest in the profits or capital of a partnership.

## I.   Determinative Issue on Appeal

In order to hold the individual Creative partners liable for the $1.35 million withdrawal liability of Wolf Baking, Central States must prove (1) that Creative was under "common control" with Wolf Baking and (2) that both Creative and Wolf Baking were "trades or businesses."  See 29 U.S.C. § 1301(b)(1).  See, e.g., Central States v. Personnel, Inc., 974 F.2d 789, 792 (7th Cir. 1992); Central States v. White, 2000 WL 690346, *4 (N.D. Ill.); Central States v. Stroh Brewery Co., 220 B.R. 959 (Bankr. N.D. Ill. 1997). The district court found that the two entities involved, Creative and Wolf Baking, were never under common control, and therefore that the Creative partners were not liable for Wolf Baking's debt under the MPPAA.  Because the district court apparently did not reach the issue of "trades or businesses," we are called upon to decide only whether Creative and Wolf Baking were under common control under the MPPAA, applicable Treasury regulations, and Louisiana partnership law.

42

II.   The MPPAA and the Treasury Regulations
under section  414(c) of Title 26

The MPPA provides that "under regulations prescribed by the [Pension Benefit Guaranty Corporation], all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as a single employer.  The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26."  29 U.S.C. § 1301(b)(1).  In the absence of independent regulations promulgated by the corporation, we refer to the pertinent Secretary of the Treasury's regulations, 26 CFR § 1.414(c).

The criteria for determining whether there is common control of a "brother-sister group of trades or businesses" is provided by 26 CFR § 1.414(c)-2(c).  The definition of such a group requires, inter alia, that the same persons own a controlling interest in each of the trades or businesses in question.  With respect to partnerships, § 1.414(c)-4(a) states: "In determining the ownership of an interest in an organization for purposes of § 1.414(c)(2) . . . the term 'interest' means: in the case of . . . a partnership, an interest in the profits or capital."  26 C.F.R. § 1.414(c)-4(a).

43

The majority apparently assumes that the regulation implicitly recognizes that an "interest in the profits or capital" of a partnership may be transferred by a single partner to a third party who is not a partner. The majority does not cite any authority for that proposition, and I have found no indication of such a phenomenon. In the common usage of the Internal Revenue Code, the Secretary of the Treasury's regulations, tax law scholars, and tax law practitioners, "capital interest" refers, in the partnership context, to a partner's capital interest. In fact, the Internal Revenue Code and regulations evidently presume that only the partners own interests in the capital of the partnership.[58] See 26 U.S.C. §§ 706(b)(1), 706(b)(3), 707(b)(1)(A), 707(b)(2)(A), 708(b)(2)(A), 708(b)(2)(B), 743(b); 26 C.F.R. §§ 1.721-1(b)(1), 1.704-1(e). Regulation § 1.704-1(e), which "defines a capital interest as any interest in the assets of the partnership to which the partner is entitled upon withdrawal from the partnership or upon

---

[58] The same is true with respect to a "profits interest" in a partnership. See cited material in the text accompanying note 4; ARTHUR B. WILLIS, ET. AL, PARTNERSHIP TAXATION ¶ 1.07[4] at 1-114 (6th Ed. 1999) ("Neither the Code nor the Regulations contains a definition of a profits interest in a partnership. However, Regulation §§ 1.721-1(b)(1) and 1.704-1(e)(1)(v) discuss partnership capital interests in such a way as to indicate that a profits interest is one which does not entitle the partner to share in partnership assets upon the partner's withdrawal from the partnership or upon the partner's liquidation.") (emphasis added). However, the majority opinion focuses on whether Beychok acquired a "capital interest" (presumably because it is indisputable that he had no right to share in the profits of Creative), so that is the focus of my dissent as well.

44

the liquidation of the partnership and distinguishes that interest from a mere right to participate in the earnings and profits of the partnership[, provides an] . . . appropriate definition for most, if not all, purposes of the Code." ARTHUR B. WILLIS, ET. AL, PARTNERSHIP TAXATION ¶ 1.07[3], at 1-112 (6ᵗʰ Ed. 1999)(hereinafter "Willis")(emphasis added).[59] Consequently, I believe the majority is mistaken in its apparent assumption that the Federal tax laws and Treasury regulations suggest the existence of substantive partnership laws permitting a single partner to favor third persons with free-floating interests in the profits and capital of the partnership without the consent of the other partners.

### III. Louisiana Law of Partnerships

Proceeding under the false conception that someone other than a partner can hold a capital interest in a partnership under the applicable Federal Tax laws and Treasury regulations, the majority opinion mistakenly concludes that such an arrangement is possible under Louisiana partnership law. The majority concludes that (1) under Louisiana law any partner of a partnership, without either authorization by the partnership agreement or the unanimous consent of the partners, has the legal power to create and transfer to a

---

[59] In explaining the significance of the terms "capital interest" vs. "profits interest" in a partnership for tax purposes, Willis states that "[i]n several areas of partnership tax law, important consequences turn on the measurement of the partners' interests in capital, profits, or both." Id. at 1-110 (emphasis added).

45

third person a capital or an income interest in the partnership; and that (2) Central States proved by a preponderance of the evidence that the undefined "interest" in Creative which Terry Smith transferred to Beychok was intended by them to be an interest in the capital of the partnership. In my opinion, the majority's interpretation of the Louisiana partnership law provisions is contrary to the plain meaning of the law, and its finding that Terry Smith intended and was authorized to transfer a capital interest in Creative to Beychok in the June 1, 1986 agreement is not supported by the contract or the record as a whole.[60]

---

[60] I also disagree with the majority opinion's statement of the law with respect to releases of future liability. The majority, supra n.46, summarily dispenses with Creative's estoppel argument by concluding, in part, that the release agreement could not be construed as releasing the withdrawal liability claim as the agreement was executed before withdrawal liability was triggered and assessed.

Louisiana law clearly allows releases of future actions before they arise if the parties clearly so intend. La. Civ. Code art. 3073; Brown v. Drillers, Inc., 630 So.2d 741, 744, 753 (La. 1994); Ritchey v. Azar, 383 So.2d 360, 363 (La. 1980); Bogalusa Community Med. Ctr. v. Batiste, 603 So.2d 183, 188 (La. App. 1 Cir. 1992). See also America's Favorite Chicken Co. v. Suryoutomo, 889 F.Supp. 916, 918 (E.D. La. 1995)(assignment agreement released all past, present, or future claims arising under franchise agreement). Relinquishing future rights of action is not against public policy unless such rights arise from physical injury or from the gross fault or intentional wrong of another party. Daigle v. Clemco Industries, 613 So.2d 619, 623 (La. 1993). Such releases, however, will be narrowly construed to assure the parties understand the agreement and its consequences. Brown, 630 So.2d at 753.

Furthermore, as I read all of the passages of the authority cited by the majority opinion, the common law is consistent with Louisiana law in this respect. American Jurisprudence Second provides, in pertinent part,

A.  Terry Smith Was Not Authorized to Enter
the Transaction on Behalf of Creative

For proof that Beychok owned a capital interest in Creative, Central States relies upon the June 1, 1986 written contract whereby Terry Smith professed to transfer to Sheldon Beychok an undefined "interest" in the Creative partnership.  Smith was the only signatory or party who claimed that he acted in behalf of Creative. Jack S. Rome, Jr., a partner in Creative, professed to act and sign the contract only on behalf of Wolf Baking.  Beychok signed only for himself individually. Central States failed to introduce any evidence to prove that the other partners of Creative, Jack S. Rome, Jr., Suzanne McCraine Rome, and Sandra Theriot Smith, authorized or ratified Smith's transfer of the undefined "interest," much less an interest in the capital of Creative, to Beychok.  Even if it could be assumed without supporting evidence that Rome, as a partner in

---

> The scope of a release is determined by the intention of the parties as expressed in the terms of the particular instrument, considered in the light of all the facts and circumstances.

66 AM. JUR. 2D Release §30, p. 706.

> [R]eleases of rights which have not yet matured under contracts have been held valid and are self-operative, and discharge the future rights or claims when they arise.  A release which covers only a present right will not be construed to discharge a demand which was then uncertain and contingent.

66 AM. JUR. 2D Release § 33, p. 710. (emphasis added).  The ultimate effect of the release, therefore, depends on the parties' intent. Accord  C.J.S. Release § 66, p. 617.

47

Creative, by signing the contract only for Wolf Baking, consented for himself to Smith's transfer of an undefined "interest" to Beychok, there is still no evidence of consent by the other partners and none that Rome intended for Smith to transfer an interest in the capital of Creative to Beychok.

### B. Such Unauthorized Transfer Is Not Allowed Under Louisiana Law

Under Louisiana law, a partnership is a juridical person, distinct from its partners. La. Civ. Code art. 2801. The legislative decision to establish a partnership as a separate and distinct entity, different from its partners, expressly reflected in Article 2801, permeates all of the Louisiana Civil Code's partnership provisions. Max Nathan, Jr., Reporter, Partnership Law Revision Committee, Introduction: 1980 Partnership Revision, 12 West's LSA Louisiana Civil Code pp. 3, 5 (1994). When partners create a partnership, they utilize contract law to create a new, separate and distinct legal entity. Id.

Unless the partners have agreed otherwise in the partnership agreement or subsequently, each partner participates equally in the profits, commercial benefits, and losses of the partnership. La. Civ. Code art. 2803. Unanimous agreement of the partners is required to amend the partnership agreement, to admit new partners, or to terminate the partnership. La. Civ. Code art. 2807. Major decisions of this type obviously are of sufficient importance to

48

require the unanimous agreement of the partners.  Id., comment(b).

In the absence of an express prohibition in the partnership

agreement, a partner may share or associate a third person in his

own interest in the partnership without the consent of his partners,

but this association in the single partner's interest does not make

the third person a member of the partnership.  La. Civ. Code art.

2812 and comment.

A partner is a mandatary or agent of the partnership for all

matters in the ordinary course of its business, except for the

alienation, lease, or encumbrance of the partnership's immovables.

La. Civ. Code art. 2814.  The scope of authority of the mandate

created by this article is limited to acts within the ordinary

course of the business of the partnership.  Id., comment (a).

The Civil Code provides for the cessation of a partner's

membership in the partnership due to certain causes and for the

effects of that cessation of membership.  A partner ceases to be a

member of a partnership upon any of the following:  his death or

interdiction; his being granted an order for relief under Chapter

7 of the Bankruptcy Code; his interest in the partnership being

seized under a writ of execution and not released within thirty

days; his expulsion from the partnership; or his withdrawal from the

partnership.  La. Civ. Code art. 2818.  The occurrence of any of

the enumerated events  terminates the membership of the partner, not

the partnership itself.  Id., comment(a).  Upon such a cessation of

membership, the former partner, his successors, or the seizing creditor is entitled to an amount equal to the value that the former partner's share had at the time membership ceased, and the partnership must pay in money that amount as soon as it is determined. La. Civ. Code arts. 2823, 2824. This amount bears interest from the time the party ceases to be a partner. La. Civ. Code 2824 and comment (b). The former partner, his successor, or his seizing creditor is not entitled to an interest in the assets of the partnership, but is only entitled to be paid an amount equal to the value of his interest as of the time his membership ceased. La. Civ. Code art. 2823, comment (a); La. Civ. Code art. 2824.[61] The term "successors" includes heirs, assigns, or anyone standing in the shoes of the former partner. La. Civ. Code art. 2823, comment (b).

Applying the legal principles of partnerships to the present case, it is clear that Terry Smith's act in entering the 1986 agreement did not have the legal effect of granting Beychok a right to a share in the capital, profits, benefits or assets of the Creative partnership. Obviously, Terry Smith's actions exceeded a

---

[61] The rule that the partnership need only make a payment in money protects the partnership in that it does not have to partition its assets in order to make a payment. La. Civ. Code art. 2824, comment (a). The value of the interest may be set by the partnership agreement or by separate agreement, or it may be judicially determined pursuant to the provisions of Article 2825. La. Civ. Code art. 2823, comment (a).

50

partner's scope of authority to act as an agent for the partnership, which is limited to acts within the ordinary course of business of the partnership.  La. Civ. Code art. 2814, comment (a).  No one contends that Smith's action was within the ordinary course of business.  Creative's partnership agreement expressly provided for equal participation by the partners and did not authorize any partner to grant a third person a share in the capital, profits, income, benefits, or assets of the partnership or to effect a change in the equal one-fourth share of each of the four partners in the capital, profits, benefits, and assets of the partnership.  In fact, Creative's articles of partnership expressly provide the following:  "The net profits of the partnership shall be divided equally among the partners and the net losses shall be borne equally among the partners,"  Articles of Partnership of Creative Development Company, Article IV; "[t]he relationship between [the partners] can be varied only by agreements in writing signed by [the partners] concurrently herewith or subsequent hereto,"  Id., Article XVII; and "[t]his agreement is subject to amendment only with the consent of all partners, and such amendment shall be effective as of such date as may be determined by them."  Id., Article XVIII.

Even in the absence of these stipulations in the partnership agreement, Louisiana Civil Code articles 2803 and 2807 would mandate equal participation by the partners and prohibit amendment of the partnership agreement unless there had been unanimous consent

51

thereto by the partners.[62]  La. Civ. Code art. 2803, comment (a);
La. Civ. Code art. 2807.

The parties introduced no evidence that the partners unanimously agreed, either by amendment of the articles or by separate agreement, to grant Beychok an interest in the capital, assets, or profits of the partnership, to change the relationships of the partners, or to modify the right of each of the four partners to share equally in the capital, profits, benefits, and assets of the partnership.  In rejecting Central State's contention that Beychok had been admitted as a partner in Creative Development, the majority opinion correctly concludes that "[i]n short, as the unanimous consent of the partners was not evidenced in the 1986 Agreement, then as a matter of law Beychok could not have been admitted as a partner."  Maj. Op. at 18.  For the same reason, as there was no unanimous consent of the partners to amend the partnership contract to grant an interest in the capital of the partnership to Beychok, or to change the relationships of the partners, Beychok, as a matter of law, could not have been granted an interest in the capital, income, benefits, or assets of the Creative partnership by Terry Smith.  Partnership agreements are

---

[62]    See GLENN G. MORRIS AND WENDELL H. HOLMES, 7 LOUISIANA CIVIL LAW TREATISE—BUSINESS ORGANIZATIONS §  2.08 at 69 ("Partnership law . . . has . . . guarded carefully the right of each partner to approve of the identity of all those with whom he is to associate as a coowner.").

contracts which cannot be changed without the consent of the partners.[63]

The majority opinion's conclusion that each partner of a partnership, without the consent of the other partners, can legally transfer to a third person an interest in the capital of the partnership is based on faulty reasoning, i.e., that if a partner can unilaterally act so as to affect his own individual interest he can also act alone to affect the other partners' interests in the capital of the partnership.[64] As noted supra, however, such autonomous action by Terry Smith was expressly prohibited by the

---

[63] See GLENN G. MORRIS AND WENDELL H. HOLMES, 7 LOUISIANA CIVIL LAW TREATISE—BUSINESS ORGANIZATIONS § 2.16 at 95-96 (1999)("The unanimity requirement is imposed by the Code or by ancillaries with respect to five decisions apparently considered to be fundamental: amending the contract of partnership, admitting new partners, terminating partnership, . . . allowing a partner to withdraw from the partnership if the partnership has been constituted for a term, and merging the partnership with another partnership or business organization. In a sense, every one of the listed decisions may be considered simply variations on the same theme: to amend the contract of partnership . . . requires the unanimous consent of the parties to the contract, i.e., the partners. . . . [P]artnership agreements are considered simple contracts, not subject to change without the approval of the affected parties.")(footnotes and citations omitted).

[64] The fallacy of the majority's position is that Louisiana law clearly does not allow a single partner to transfer to a non-partner an interest in the capital of a partnership that all of the partners own in common. Each of the provisions of Louisiana partnership law relied upon by the majority involve the specific effects upon a single partner's interest in the partnership caused by the death or act of that partner with regard to his own creditors or assignees. The other partners' interests in the partnership are not affected by those acts or events.

Creative partnership agreement. Furthermore, even without the express prohibitions in the Creative articles of partnership, the law prohibits such solo action by a partner affecting the interests of the other partners. La. Civ. Code art. 2807. Otherwise, any partner acting alone and contrary to the wishes of the other partners could dilute each partner's right to receive his or her original share of the capital, profits, benefits, and assets of the partnership, and thus single-handedly change the relationships between the partners and amend the partnership agreement.

The majority opinion mistakenly relies on Louisiana Civil Code articles 2818 and 2823, governing the causes and effects of cessation of partnership membership, in its attempt to show that one partner without consent of the others may amend the partnership agreement to grant an interest in the capital of the partnership to a third person. When a partner ceases to be a member for one of the reasons stated in Article 2818, and the partnership continues to exist, the former partner, his successor, or the seizing creditor does not acquire an interest in the capital of the partnership as the majority opinion assumes. Instead, the partnership is obliged to pay such person an amount equal to the value that the share of the former partner had at the time the membership ceased. La. Civ. Code art. 2823 and comment (a); La. Civ. Code art. 2818 and comments. That amount draws interest from the time that the former partner's membership ceased. La. Civ. Code art. 2824. Thus, a

54

debtor-creditor relationship between the partnership and the former partner, his successor, or the seizing creditor is established and fixed as of the time of the cessation of membership. The Code clearly does not provide that a former partner's interest in the capital may continue after the cessation of his membership in the partnership so as to appreciate or depreciate with the value of the partnership. The cessation of partnership membership has only the specific effects provided for by the Code. Thus, the partnership's obligation to a former partner, successor, or seizing creditor is expressly provided by law and only in certain specific instances. Articles 2823 et seq. do not expressly or implicitly authorize a partner to amend the partnership agreement to grant capital, equity, or profits interests in the partnership to third persons.

Furthermore, although the majority opinion accurately quotes from Article 2812 and its comment regarding a partner sharing his or her interest with a third person, the majority draws the incorrect inference that a partner can make a third person a direct owner of an interest in the capital of the partnership by sharing his interest. That inference is at odds with Article 2812, which adopts the approach of the French Civil Code. See id., comment. Planiol explains French Civil Code art. 1861 as follows:

> [T]he law permits each partner to join with him someone to share with him the risks and benefits of his share. There is then formed a little partnership of a subordinate character between such partner and the third person with whom he contracts, without the other partners

being entitled to benefit from, or being liable on such contract as to which they are strangers (Art. 1861). The third person thus associated in a subordinate way with the operations of the partnership is called a "*croupier*." [fn.16]

> [fn.16:] The use of this word in card or dice games is very old. It is an allusion to the habit which people who formerly travelled by horse had, when carriages were rare and the roads bad, of picking up riders on the crupper to render them a service.

2 PLANIOL, CIVIL LAW TREATISE NO. 1975 (La. State Law Institute transl. 1959). When a partner elects to share his interest in the partnership with a third person, he cannot thereby establish any relationship between the third person and the partnership or the other partners. The latter remain "strangers" to and insulated from liability due to the fact that the little subordinate partnership is formed strictly between the partner and the third person. In short, the third person is taken on as a "croupier" only by the partner with whom he contracts and he rides only on that partner's "crupper." Consequently, Article 2812 does not authorize a partner to create partnership obligations to a third person by sharing his partnership interest with a third party. See MORRIS AND HOLMES § 2.08 at 68-74. Thus, the majority opinion errs in relying on Article 2812 to support its theory that Terry Smith created and transferred a capital interest in Creative Development because Article 2812

contemplates merely the sharing of a partner's existing share in the partnership.[65]

Thus, it is clear that under Louisiana law a single partner cannot amend the partnership contract or grant an interest in the capital of the partnership to an outsider without the authorization of the other partners, and that Central States failed to adduce evidence or proof that Terry Smith was vested with authority to transfer any interest in Creative to anyone. Moreover, Central States failed to prove that the undefined "interest" which Terry Smith professed to transfer to Beychok was intended even between them to be a capital interest in the Creative partnership.

The law is well settled in Louisiana, this circuit, and generally that a plaintiff who claims that a defendant is legally subjected to a contractual obligation has the burden of proving every fact essential to establish the obligation and that the defendant was a party to and bound by the obligation. E.g., National By-Products, Inc. v. United States, 405 F.2d 1256, 1264 (Ct.Cl. 1969); Bell v. Ralston Purina Co., 257 F.2d 31, 32 (10th Cir. 1958); Carp v. California-Western States Life Ins. Co., 252 F.2d 337, 339 (5th Cir. 1958); La. Civ. Code arts. 1831 (1987) and 2232

---

[65] See also Black's Law Dictionary p. 1121 (6th ed. 1990)("*Subpartnership*. One formed where one partner in a firm makes a stranger a partner with him in his share of the profits of that firm. It is not a partnership but an arrangement in which the subpartner shares in the profits and losses of a partner.")

57

(1870); <u>Kilpatrick v. Kilpatrick</u>, 660 So.2d 182, 185 (La. App. 2 Cir.), <u>writ denied</u>, 664 So.2d 444 (La. 1995); <u>Pennington Const. Inc. v. R A Eagle Corp.</u>, 652 So.2d 637 (La. App. 1 Cir. 1995); <u>Bordlee v. Pat's Const. Co.</u> 316 So.2d 16, 17 (La. App. 4 Cir. 1975); <u>Hunter Co. v. Bossier Levee Dist. of La</u>., 115 So.2d 226, 227 (La. App. 2d Cir. 1959).

Consequently, even if Central States had proved that Terry Smith was authorized by all of the partners of Creative to transfer an undefined "interest" to Beychok, the record is devoid of any evidence that the transfer of a capital interest was authorized or intended. Because there is no evidence in the record that the partners of Creative vested any authority in Smith to transfer any interest in Creative to Beychok, Smith unquestionably did not have authority to transfer a capital or profits interest to him. There is no evidence in the record that the undefined interest which Smith intended to transfer and which Beychok intended to receive was a capital or profits interest in Creative. The written contract itself does not define the interest intended to be transferred. According to the testimony of Rome and Beychok, the intent of the parties was not to transfer a capital or profits interest in Creative to Beychok, and the trial court which saw and heard the witnesses found that the parties indeed did not have such an

58

intention.[66]  Central States has fallen far short of carrying its burden to prove that a transfer of an interest in the capital of Creative was authorized, intended or effected.

### III. Issues Which Must Be Decided On Remand

I would affirm the district court's judgment dismissing Central States' claims for the reasons I have stated, and I also respectfully disagree with the majority's limitation of the issues that the district court may consider and decide on remand.  Given the majority decision, it must remand the case.  But it should send the case back for further proceedings and decision on all of the issues which the district court did not reach in its first judgment. For example, Central States must prove that Creative was a "trade or business" in order to hold it liable under a "brother-sister" or "common control" theory.  See 29 U.S.C. § 1301(b)(1). Cf. Commissioner of Internal Revenue v. Groetzinger, 480 U.S. 23 (1987); Central States v. Personnel, Inc., 974 F.2d 789 (7th Cir. 1992); Susan C. Glen, Central States v. Personnel, Inc.:  When Real Estate Investments Create Personal Liability Under the Multiemployer Pension Plan Amendments Act of 1980, 78 Minn.L.Rev. 501 (1964). Therefore, the district court should be directed on remand to hear

---

[66]    The trial court found that the "June 1986 agreement was entered into in order to substitute Bechok [sic] as the creditor of the partnership in lieu of the bakery."

59

and decide that issue, as well as any other essential element of the case not reached previously, unless of course the parties have already stipulated or admitted such issues.

## IV. Conclusion

The majority opinion is at odds with both federal law and Louisiana law, as well as the concept and purposes of partnership as a juridical entity. The majority decides, in effect, that any partner in a partnership has the autonomous legal power to transfer an interest in the capital of a partnership to third persons, which in effect allows any party to the partnership contract to unilaterally amend the contract to affect the interests, rights, and obligations of the other non-consenting partners, change the partners' relationships, and dilute each partner's interest in the capital, profits, benefits, and distribution of assets of the partnership. All of these major decisions and changes require the unanimous consent of the partners. La. Civ. Code arts. 2803 and 2807. If this were not the law, each partner would have the autonomous power to create unlimited additional capital and profits interests; each partner would be tempted or forced in self-defense to feather his or her own nest by granting additional interests to family or cronies; and the entire law of partnerships would fall into disarray and probably become defunct. As if this were not enough, the majority's reading of the Louisiana partnership law, as

this case demonstrates, would empower any partner in any partnership to subject all other partners to massive, unforeseeable personal liability, without their consent.

The Central States plaintiffs failed to demonstrate a legal basis under federal law or Louisiana partnership law for Terry Smith's authority to transfer ownership of either a "profits interest" or "capital interest" in the Creative partnership to Sheldon Beychok. Lacking proof that Smith legally effected the grant or transfer of an interest in the capital or profits of the Creative partnership to Beychok, Central States has also failed to prove that Creative and Wolf Baking were trades or businesses under the "common control" of Beychok. Because the Central States plaintiffs failed to prove either of these elements of their case, their claims against Creative and its partners individually for payment of Wolf Baking's $1.35 million withdrawal liability were properly dismissed by the district court.